**UNITED STATES v. HARTZEL.**
**SAME v. SOLLER.**
Nos. 8253, 8264.

Circuit Court of Appeals, Seventh Circuit.
Oct. 14, 1943.

Rehearing Denied Nov. 10, 1943.
Writ of Certiorari Granted Jan. 10, 1944.
See 64 S.Ct. 437.

Benedict J. Short, Ode L. Rankin, and Wm. J. Powers, all of Chicago, Ill., for appellants.

J. Albert Woll and Wm. J. Connor, U. S. Atty., both of Chicago, Ill., for appellee.

Before SPARKS, MAJOR, and KERNER, Circuit Judges.

MAJOR, Circuit Judge.

Appellants Hartzel and Soller, together with one Mecartney, were tried by a jury and found guilty of violating Secs. 3 and 4 of the Espionage Act, 50, U.S.C.A. §§ 33, 34. The indictment contained seven counts, the first six of which charged the substantive offense of sedition, while count 7 charged a conspiracy to commit such substantive offense. A motion for new trial was allowed as to Mecartney and the cause dismissed as to him. Judgment was ren-

dered against Hartzel and Soller, who have perfected separate appeals. They may both be appropriately disposed of in one opinion.

The substantive counts are predicated upon three pamphlets, entitled "The British: An Inferior Breed"; "The Jew Makes A Sacrifice: Forthcoming Collapse of America"; and "The Diseased Spinal Cord." In all of such counts, it is charged that the defendants prepared, published and distributed such pamphlets throughout the United States, while the United States was at war. Counts 1, 3 and 5 alleged that by such action the defendants wilfully and knowingly obstructed the recruiting and enlistment service of the United States, and counts 2, 4 and 6 that the defendants wilfully and knowingly did cause and attempt to cause insubordination, disloyalty, mutiny and refusal of duty in the military and naval forces of the United States, and that the defendants well knew that said pamphlets would produce the result complained of.

It perhaps would serve no good purpose to set forth all these pamphlets in their entirety, and certainly it would unduly lengthen this opinion. The one entitled "The British: An Inferior Breed" is in question and answer form, as follows:

*"Are they degenerate?*

"Plainly. Never again shall they be permitted to try to bring the slinking death of starvation to Europe, squealing hysterically as they do so about 'freedom'.

*"What is the present position of our 'protectors',* proclaimed saviors of Poland?

"Now on the lease-lend dole, they are a kept woman.

*"Are they a cultured people?*

"Standing as an outpost to the continent of Europe, they are a parasite on its art, science and civilization.

*"In what way are they kept flying?*

"The Germans keep 'em flying wherever they find them. They run at the mouth as well as the bowels.

*"Will the British Isles be policed?*

"It will be unnecessary. When the people upon whom they are fastened withdraw their support, they will collapse.

*"What is the new blasphemy?*

"Making Christianity a slimy thing for those who crawl and creep by an island breed which—possessed of an empire obtained by aggression—points the finger of

guilt at others. They are now fighting for Christ with bloody Joe.

"*Who betrayed America* to the empire of the British-Jewish yellow race?

"Rosenfeldt. We are victims of his Infantilism; he cannot stand alone.

"*Are Jews rushing forward to war* after urging you to crush 'em?

"No. But when America is exhausted they, as in Russia, will slither forth to sink their fangs into its body.

"*Are Americans united?*

"Yes. Externally with the corpus of a degenerate empire: internally with the sick body of 'our leader.'

"*What is behind the doctrine of 'no appeasement'?*

"The fear of aggression on the bloated domains of an empire which cannot stand alone;

"The inhuman cruelty of America's first blood soaked boom;

"The rumble of world revolution—a repercussion of its indecencies;

"The effort of the Jew—vicious persecutor of peoples—to save himself;

"The disease of a Paralytic who wants to be a hero as compensation for his ailment;

"The beginning of insanity as the masses of the so-called 'democracies' are led toward the destruction of Europe, homeland of the West.

"*Why was Pearl Harbor evidence of justice?*

"While trying to save a yellow race in the Atlantic we were hit a deadly blow by a yellow race in the Pacific. Like a cow hit on the head by a hammer when led to slaughter, we now follow 'our leader' as he moves forward on a sick spine to war."

The pamphlet entitled "The Jew Makes A Sacrifice: The Forthcoming Collapse of America" is in part as follows:

"Our blood soaked boom of the first World War was followed by a speculative orgy, then collapse. A similar maladjustment now seeks an outlet in another blood soaked boom which will end as before. In all of this the Jew—oriental hyphenated American, propagandist for bloody Joe and the British (Jewish) empire—has been an eager participant. Indeed, like a snake forced from its nest, the slimy blood lust of the 'holy people' now stands revealed— for is it not evident that the Jew hates bloodshed only when his own skin is in

danger? * * * Today, in fact, almost any crime may be committed in his name in connection with fine words such as 'freedom'. How else justify blood soaked booms; attempts to starve Europe by blockade; an alliance with bloody Joe; and the massing of enormous quantities of men and materials with which to 'crush' the Germans—except by offsetting the degeneracy of such acts by declaring them to be dictated by the 'spirit'.

"The oriental Japanese struck at Port Arthur, in 1904, and at Pearl Harbor while negotiating. The Jew does not have their manfulness for open warfare, but he will —while conserving his own blood—eventually strike those with whom he lives in the back. He is now infiltrating into Government jobs under cover of 'no race prejudice'. He is, in fact, 'dying' for the coming of bolshevism by making ready for your collapse. After many of the young men of America are killed—when the sick, the exhausted, the cunning remain—then he will, as in Russia, crawl from his nest. * * *"

The pamphlet entitled "The Diseased Spinal Cord" is in part as follows:

"Wilson died an invalid; Roosevelt became president one. What is the social significance of his condition?

"A clue is given in the statement that syphilis is 'the result of an illness of moral, social and racial instincts' of which prostitution is an integral part. Similarly the breakdown of Wilson after the 'peace' was probably connected with reactions from the emotional debauchery of preceding years. It is, therefore, suggested that the epidemic of paralysis in New York State at a later time had a source in the weakening of nervous systems, brought about by the emotional self-masturbation of stories of the 'bad' Germans.

"Our leader—safe in Washington—escaped the actual horrors of war, but he could not escape the virus of a child's disease. As with syphilis his paralysis is indicative of severe maladjustments within the nation. He reproduces within his body our internal breakdown; he is in fact a degenerate who now seeks ways of having us cure him of his ailment. * * *

"Hidden within the present program to save humanity are germs of infantilism, paralysis and death. For we now follow, not a little child, but a man with a child's disease. * * *

"Crush my enemies screams Jewry; be bold; take the offensive; we'll back you up. We're fighting for freedom says our leader, with his sick body coiled around the brain as with a snake prepared to strike. We're fighting to save Poland say the British hysterically; we hate other peoples aggression.

"America was betrayed. The butchery, misery and death they would take to Germany must now, if necessary, be returned upon ourselves by:

"A stench from rotting carcasses of those who would again invade Europe;

"Starvation for millions of British who thought they could starve others;

"Dissolution from an internal war of race against race;

"Occupation by foreign troops until we are able to stand alone; and at last

"The appointment of a bedside cabinet to investigate the condition of (Rosenfeld) our leader."

That defendant Hartzel was the author of these pamphlets, and sent several hundred of them through the United States mail, is not disputed. There were also introduced as bearing upon the question of intent and purpose numerous other articles and pamphlets of the same general tenor, prepared and circulated by him prior to the entry of the United States into the present war.

■ Both Hartzel and Soller urgently insist that the proof failed to present a jury question and that the court erred in its refusal to direct a verdict in their favor. In deciding this question, we need not consider the proof as it pertains to each count of the indictment for the reason that the judgment could have been imposed upon any of the substantive counts. If the proof is sufficient to sustain any count, an affirmance is required. Abrams v. United States, 250 U.S. 616, 619, 40 S. Ct. 17, 63 L.Ed. 1173. It follows, therefore, that we need not discuss defendants' argument that the proof fails to show a successful accomplishment of the alleged objectives. Counts 2, 4 and 6 charge the defendants with an "attempt to cause, insubordination, disloyalty, mutiny, and refusal of duty in the military and naval forces of the United States." Whatever room there may be for difference of opinion as to whether an accomplished result must be proved when alleged, there seems little, if any, merit in the contention that such proof is required to sustain an attempt to cause such result.

■ It is argued that the publications in controversy were permissible as free speech, guaranteed by the Constitution. Certainly free speech is not an empty privilege, even during a time of war, but on the other hand, the right is not without limitation. As was said by the court in Schenck v. United States, 249 U.S. 47, 52, 39 S.Ct. 247, 249, 63 L.Ed. 470: "The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic." Location of the boundary line between that which is privileged and that which is restrained is ofttimes difficult to determine. Generally, it must be found from the character of the utterance, in connection with the time, place and manner of its making. As was said in the Schenck case, supra, 249 U.S. at page 52, 39 S.Ct. at page 249, 63 L.Ed. 470: "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent. It is a question of proximity and degree. When a nation is at war many things that might be said in time of peace are such a hindrance to its effort that their utterance will not be endured so long as men fight and that no Court could regard them as protected by any constitutional right."

■ A charge of attempt to accomplish that which Congress has proscribed must depend upon intent or motive, and ordinarily presents a jury question. As was said by the court in Pierce v. United States, 252 U.S. 239, 249, 40 S.Ct. 205, 209, 64 L. Ed. 542: "If its probable effect was at all disputable, at least the jury fairly might believe that, under the circumstances existing, it would have a tendency to cause insubordination, disloyalty, and refusal of duty in the military and naval forces of the United States."

And again, the court on the following page stated: "What interpretation ought to be placed upon the pamphlet, what would be the probable effect of distributing it in the mode adopted, and what were defendants' motives in doing this, were questions for the jury, not the court, to decide."

■ It is true, as pointed out by the defendants, that in the Pierce case, as well

as in some of the other cases in which the Supreme Court has announced a similar rule, the alleged seditious pamphlets or speeches contain some direct reference or appeal to those eligible for or actually engaged in the military service. No doubt in such instances the intent or motive is more readily apparent. We are of the view, however, that the test enunciated by the Supreme Court as to what constitutes a seditious utterance is not to be limited merely to those cases where a direct appeal is made. If the condemned utterance is reasonably calculated to produce the proscribed result, the purpose and motive is within the province of a jury.

Defendant Hartzel stated his motive thus: "Finally, the prime motive which impelled me in writing and distributing the articles discussed above, was the hope that they might tend to create sentiment against war amongst the white races and in diverting the war from them, to unite the white races against what I consider to be the more dangerous enemies, the yellow races."

It is inconceivable that his defamatory statements concerning the President, the British or the Jews, could have created any sentiment against war or have been any aid in uniting the white against the yellow races. It is equally inconceivable that the attacks were made with any such motive. It is likewise inconceivable that any purpose was sought to be achieved consistent with the welfare of the country. On the other hand, it is entirely reasonable to believe that the purpose was to interfere with the successful prosecution of the war. It must be assumed, we think, that Hartzel expected those who read his pamphlets to accept their contents as the truth; otherwise, there could have been no purpose in their circulation. Certainly it cannot be reasonably insisted that the defamatory and vicious attack made upon the President of the United States, the Commander-in-Chief of the armed forces of the nation, if believed as the defendant Hartzel expected, would not seriously affect, if not destroy, the morale of the nation, both the civilian and the military. With the morale thus destroyed, insubordination, disloyalty and mutiny would be the inevitable result. Publications concerning the British and the Jews, if believed, would no doubt produce a similar result.

It may be, we hope it is a fact, that there are few if any persons in this country so naive as to place any credence in the articles complained of, and it may be that no great harm resulted from their publication. Assuming such to be the case, Hartzel is not relieved of attempting to do that which Congress has proscribed.

Even though an intent is the gist of the offense, it is not necessary that such intent be shown by direct proof. It is to be gathered from the defendants' acts, together with the surrounding facts and circumstances. We see no reason why the intent in a case of the instant character may not be found in the same manner as in any other case where it is an essential element. If a person deliberately shoots at another without reason or excuse, he would be guilty of an assault with intent to kill. We suppose that if he deliberately fired a gun into an assembly of people, all of whom were strangers, he likewise would be guilty of an assault with intent to kill any person who might be injured. It is a familiar rule of law, and we think applicable in the instant case, that a person who acts in reckless disregard of the rights of others is liable for the consequences of such acts. Under such circumstances, he is presumed to intend that which is calculated to result from his act. "Men must be held to have intended, and to be accountable for, the effects which their acts were likely to produce." Abrams v. United States, supra, 250 U.S. at page 621, 40 S.Ct. at page 19, 63 L.Ed. 1173. We are of the view that a jury question was presented as to Hartzel, especially under counts 2, 4 and 6.

As to the defendant Soller, a different situation is presented. If the judgment against him is affirmed, it must be solely upon the ground that he mimeographed the alleged seditious pamphlets. The proof discloses that Soller first met Hartzel in March or April of 1941, when the latter came to his office and made inquiry as to the price of mimeographing, in which business Soller was engaged. On three occasions, Soller mimeographed pamphlets from manuscripts furnished by Hartzel. He charged and was paid his usual compensation for such work. There is no proof that Soller at any time prior to doing the work was advised or had knowledge of the use to which the pamphlets were to be put by Hartzel. True, after the third and last lot of pamphlets had been delivered to Hartzel, Soller became suspicious and upon inquiry learned from Hartzel that the pamphlets were being sent through the mail. Soller

as a witness even denies that he had knowledge of the contents of the pamphlets, except as to certain words which attracted his attention as they were being mimeographed. Incredible as this may sound on its face, a reading of his testimony furnishes support to the plausibility of such statement. At any rate, there is no proof as to his knowledge. A few minor circumstances relied upon by the government are without significance.

We are of the view and so hold that the proof was not sufficient to present a jury question as to Soller and that he was entitled to a directed verdict. What we have said applies to the conspiracy as well as the substantive counts. The proof fails to show an agreement between these two defendants or that they were acting in concert or in a conspiracy, as charged.

Complaint is also made of the court's charge as it pertains to the matter of intent. What we have said on that subject largely disposes of the criticism and we shall not discuss it further.

The proof being sufficient to present a jury question on some of the counts as to the defendant Hartzel, the judgment as to him is affirmed. As to the defendant Soller, it is reversed.