## HARTZEL v. UNITED STATES.

No. 531. Argued April 25, 1944.—Decided June 12, 1944.

*Mr. Ode L. Rankin* for petitioner.

*Solicitor General Fahy,* with whom *Assistant Attorney General Tom C. Clark, Mr. Robert S. Erdahl,* and *Miss Beatrice Rosenberg* were on the brief, for the United States.

Mr. Justice Murphy announced the conclusion and judgment of the Court.

For the first time during the course of the present war we are confronted with a prosecution under the Espionage Act of 1917.[1] The narrow issue is whether there was sufficient evidence to support the jury's determination that petitioner violated the Act in that, in time of war, he willfully attempted to cause insubordination, disloyalty, mutiny and refusal of duty in the armed forces and willfully obstructed the recruiting and enlistment service of the United States.

Petitioner and two others were charged in a seven-count indictment with violations of the second and third clauses[2] of § 3 of the Act, together with a violation of § 4. It was alleged that in time of war they published and disseminated three pamphlets to numerous persons and organizations, among whom were individuals available and eligible for recruitment and enlistment in the military and naval forces of the United States as well as individuals already members of the armed forces. Counts 1, 3 and 5 charged that by these actions they willfully obstructed the recruiting and enlistment service of the United States in violation of the third clause of § 3. Counts 2, 4 and 6 charged that these activities constituted a willful attempt to cause insubordination, disloyalty, mutiny and refusal

---

[1] Espionage Act of June 15, 1917, c. 30, 40 Stat. 217, 50 U. S. C. § 31 et seq.

[2] The second and third clauses of § 3 of the Act provide as follows: "Whoever, when the United States is at war, . . . shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service of the United States, shall be punished by a fine of not more than $10,000 or imprisonment for not more than twenty years, or both." 40 Stat. 217, 219, 41 Stat. 1359, 50 U. S. C. § 33.

of duty in the military and naval forces of the United States in violation of the second clause of § 3. Count 7 charged a conspiracy to violate § 3, in violation of § 4 of the Act. Petitioner was found guilty on all counts and was sentenced generally to five years in prison. The court below affirmed his conviction on appeal.[3] 138 F. 2d 169. The importance of the issues involved led us to grant certiorari. 320 U. S. 734.

Petitioner, an American citizen, was born 52 years ago in Pennsylvania. His ancestors, of Scotch, Irish and German descent, came to this country over 120 years ago. He enlisted in the armed forces in 1917 and served overseas. After his honorable discharge in 1919, he was employed in the city health department at Akron, Ohio, while earning a degree in science at Akron University. He then took courses in economics and political economy at the University of Chicago and became a financial analyst and statistician for various banks, investment brokers and investment companies in Chicago. After 1938 he was employed as an auditor and statistician, first by the State of Illinois and then by the federal government in corporations in Detroit and Chicago producing material for the United States Army Air Corps. During all this time he had constantly engaged in economic research on his own behalf and several articles by him were

---

[3] Petitioner's co-defendants—Mecartney, an attorney, and Soller, the mimeographer—were found guilty on counts 5, 6 and 7. But the trial judge set aside Mecartney's conviction on a motion for a new trial on the ground that there was no evidence that he had any active part in the distribution of the pamphlets produced by petitioner. Soller's conviction was set aside by the court below on the ground that there was no proof that he knew what use petitioner made of the pamphlets. Mecartney and Soller were the only co-conspirators of petitioner named in the indictment and the setting aside of their convictions makes it impossible to sustain petitioner's conviction upon the basis of count 7, the conspiracy count.

published in reputable business and financial periodicals. There was no evidence of his having been associated in any way with any foreign or subversive organization.

Prior to the entry of the United States into the present war, petitioner wrote several short, articles containing scurrilous and vitriolic attacks on the English, the Jews and the President of the United States. Americans were urged not to ally themselves with the English. Only a German victory, it was said, would bring "increased stability and safety for the West." Petitioner had certain of these articles mimeographed by various individuals in Chicago, including one Elmer Soller, who was later indicted as a co-defendant with petitioner. Several hundred copies of the mimeographed articles were mailed by petitioner to individuals and organizations appearing on his mailing list.

Petitioner then wrote three articles in 1942 which formed the basis for his conviction under the Espionage Act of 1917. These articles repeated the same themes and were marked by the same calumny and invective; they are set out at length in the opinion of the court below, 138 F. 2d at 170–172, and need not be repeated here. In substance, they depict the war as a gross betrayal of America, denounce our English allies and the Jews and assail in reckless terms the integrity and patriotism of the President of the United States. They call for an abandonment of our allies and a conversion of the war into a racial conflict. They further urge an "internal war of race against race" and "occupation [of America] by foreign troops until we are able to stand alone."

After writing these articles, petitioner had them mimeographed by his co-defendant Soller and mailed about six hundred copies of them, anonymously, to persons and organizations on his mailing list. In order to avoid detection, he deposited the envelopes in several different mail-

boxes and endeavored to leave no fingerprints.[4]  He had compiled this mailing list from several sources: (1) the World Almanac, which gave him the names of various prominent people, associations, fraternities, sororities, etc.; (2) a government publication containing a list of labor unions; (3) daily newspapers which mentioned the names of people actively engaged in the America First Committee; and (4) telephone directories at the public library which gave him the names of various state and district commanders of the American Legion.  Included in his list were such persons as United States senators, representatives, bishops and other church officials; such organizations as the Daughters of the American Revolution and We the Mothers Mobilize were also included.

The Government proved that two of these pamphlets were mailed to and read by the Commanding General of the United States Army Air Forces and a colonel attached to the General Staff.  All three pamphlets were mailed to the United States Infantry Association, which publishes the Infantry Journal, a service publication, and were read at its headquarters by two Army officers in the course of their duties.  The evidence also showed that

---

[4] Petitioner testified that "I sent the documents out anonymously because I almost lost my job several times and I knew I had to be careful and also because of a great deal of espionage in the community.  I did not sign my name to the documents I sent out for the same reason. . . . I took them out and dropped them in several boxes.  I did that because with such a large quantity of them, I thought someone might throw them out.  I mailed them all at once, but I dropped one hundred in one box and another hundred in each of four or five boxes.  I didn't put them all in one box simply because, if someone would throw one out they would throw them all out.  I had a suspicion that someone in authority might well find these articles and throw them out for the reasons I gave you.  I had heard that fingerprints would be identified so I put my hand over it like that (indicating).  I was suspicious of it for the same reasons I gave you."  There was no evidence contradicting any of this testimony.

one or more of the pamphlets were received in the mail by the president of Northwestern University, the American Newspaper Publishers Association, the Kiwanis International, the Lions International, the Air Line Pilots Association and the American Legion, Department of Illinois. Individuals registered under the Selective Training and Service Act of 1940 and employed by these various organizations read the pamphlets in the ordinary course of their work, including one 20-year-old clerk whose duty it was to open the incoming mail at the office of the Lions International. In addition, envelopes addressed to at least eighteen high-ranking Army officers were found secreted under a bathtub in petitioner's home, together with several of the pamphlets.

Shortly after being taken into custody, petitioner signed a statement in which he claimed that "the prime motive which impelled me in writing and distributing the articles discussed above, was the hope that they might tend to create sentiment against war amongst the white races and in diverting the war from them, to unite the white races against what I consider to be the more dangerous enemies, the yellow races." At the trial he testified that "I thought there was a trend toward Communism, and I thought it was quite a dangerous position because of warfare between the white races, it would be the cause of war between the white and yellow races, and rather than have it beat into us, we might as well face the facts and know what we were facing, a certain group of Communists discussing methods, their viewpoints, I wanted to help minimize that so we could again have public standpoint established in this country." He said he thought his articles might improve the morale of persons available and eligible for recruiting and enlistment in the armed forces, though he retracted this statement on cross-examination. His efforts, he thought, "were political in character" and "the effect on the troops of saying that America was betrayed would be

for them to consider whether it was or not and, if so, to fight for Americans."

On the basis of these facts, petitioner was found guilty of violating the second and third clauses of § 3 of the Act. These clauses are directed at those who, in time of war, "willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States," or who, in time of war, "willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service of the United States." Thus these clauses punish the making and dissemination of statements and writings which are intended to have the evil effects set forth by Congress. No question is here raised as to the constitutionality of these provisions or as to the sufficiency of the indictment returned thereunder. But such legislation, being penal in nature and restricting the right to speak and write freely, must be construed narrowly and "must be taken to use its words in a strict and accurate sense." Mr. Justice Holmes, dissenting in *Abrams* v. *United States,* 250 U. S. 616 at 627.

The language of the second and third clauses of § 3 makes clear that two major elements are necessary to constitute an offense under these clauses. The first element is a subjective one, consisting of a specific intent or evil purpose at the time of the alleged overt acts to cause insubordination or disloyalty in the armed forces or to obstruct the recruiting and enlistment service. This requirement of a specific intent springs from the statutory use of the word "willfully." That word, when viewed in the context of a highly penal statute restricting freedom of expression, must be taken to mean deliberately and with a specific purpose to do the acts proscribed by Congress. Cf. *United States* v. *Murdock,* 290 U. S. 389 at 394; *United States* v. *Illinois Central R. Co.,* 303 U. S. 239 at 242; *Browder* v. *United States,* 312 U. S. 335 at 341;

*Spies* v. *United States,* 317 U. S. 492 at 497. The second element is an objective one, consisting of a clear and present danger that the activities in question will bring about the substantive evils which Congress has a right to prevent. *Schenck* v. *United States,* 249 U. S. 47. Both elements must be proved by the Government beyond a reasonable doubt.

The requisite specific intent in such a case as this may be proved not only by the language actually used in the statements or writings themselves but also by the circumstances surrounding their preparation and dissemination. But, so far as the record in this case is concerned, neither of these sources is productive of evidence from which a jury could properly find beyond a reasonable doubt that petitioner had such an intent at the time he composed and mailed the three pamphlets. For that reason alone the conviction must be reversed.

There is nothing on the face of the three pamphlets in question to indicate that petitioner intended specifically to cause insubordination, disloyalty, mutiny or refusal of duty in the military forces or to obstruct the recruiting and enlistment service. No direct or affirmative appeals are made to that effect and no mention is made of military personnel or of persons registered under the Selective Training and Service Act. They contain, instead, vicious and unreasoning attacks on one of our military allies, flagrant appeals to false and sinister racial theories and gross libels of the President. Few ideas are more odious to the majority of the American people or more destructive of national unity in time of war. But while such iniquitous doctrines may be used under certain circumstances as vehicles for the purposeful undermining of the morale and loyalty of the armed forces and those persons of draft age, they cannot by themselves be taken as proof beyond a reasonable doubt that petitioner had the narrow intent requisite to a violation of this statute.

Nor do the circumstances of the distribution of the three pamphlets, supplemented by petitioner's pre-trial statement, his testimony and the similar articles written and disseminated by him before the war, supply sufficient evidence of the necessary intent. There was no evidence that petitioner intended to influence military personnel or individuals of draft age in the manner forbidden by the statute in composing his mailing list or in sending his pamphlets to those listed therein. His purpose, rather, appears to have been to obtain the names of prominent individuals and organizations and to propagate his ideas among them. The fact that some of these individuals and some of the representatives of these organizations were of draft age was not shown to have been dominant, or even present, in petitioner's mind or to have motivated him in any degree. And the fact that he mailed his pamphlets to at least four high-ranking Army officers and addressed envelopes to at least eighteen others is not evidence from which the jury could infer beyond a reasonable doubt that he intended to cause insubordination, disloyalty, mutiny or refusal of duty among them. Their inclusion in a mailing list of six hundred persons and organizations is quite consistent with a mere intent to influence public opinion and to circulate malicious political propaganda among outstanding personages, whether they be in the armed forces or not.

His prewar writings, if they should be taken into account at all, are no more indicative of the necessary intent than are the three pamphlets in issue. His statements and testimony concerning his motive in preparing and distributing the three pamphlets are likewise indecisive. Proof that he intended, in his words, to "create sentiment against war amongst the white races" and to "unite the white races against what I consider to be the more dangerous enemies, the yellow races" does not satisfy the burden which rests on the Government to prove beyond a

reasonable doubt that petitioner had the purpose or intent to do what is outlawed by § 3 of this Act. Thoughtlessness, carelessness and even recklessness are not substitutes for the more specific state of mind which the statute makes an essential ingredient of the crime.

We are not unmindful of the fact that the United States is now engaged in a total war for national survival and that total war of the modern variety cannot be won by a doubtful, disunited nation in which any appreciable sector is disloyal. For that reason our enemies have developed psychological warfare to a high degree in an effort to cause unrest and disloyalty. Much of this type of warfare takes the form of insidious propaganda in the manner and tenor displayed by petitioner's three pamphlets. Crude appeals to overthrow the government or to discard our arms in open mutiny are seldom made. Emphasis is laid, rather, on such matters as the futility of our war aims, the vices of our allies and the inadequacy of our leadership. But the mere fact that such ideas are enunciated by a citizen is not enough by itself to warrant a finding of a criminal intent to violate § 3 of the Espionage Act. Unless there is sufficient evidence from which a jury could infer beyond a reasonable doubt that he intended to bring about the specific consequences prohibited by the Act, an American citizen has the right to discuss these matters either by temperate reasoning or by immoderate and vicious invective without running afoul of the Espionage Act of 1917. Such evidence was not present in this case.

The judgment of the court below is

*Reversed.*

Mr. Justice Roberts:

Without discussing the evidence in detail or characterizing the petitioner's conduct, I deem it sufficient to say that I concur in the view that there was not sufficient evi-

dence in the case to warrant submission to the jury. The conviction of violation of the statute should, therefore, be reversed.

MR. JUSTICE REED, with whom MR. JUSTICE FRANKFURTER, MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON concur, dissenting:

The First Amendment to the Constitution preserves freedom of speech and of the press in war as well as in peace. The right to criticize the Government and the handling of the war is not questioned. Congress has not sought, directly or indirectly, to abridge the right of anyone to present his views on the conduct of the war or the making of the peace. The legislation under which Hartzel was tried and convicted was aimed at those who, in time of war, "shall willfully cause or attempt to cause insubordination, disloyalty, or refusal of duty, in the military or naval forces of the United States." It is only when the requisite intent to produce those results is present that criticism may cross over the line of prohibited conduct. The constitutional power of Congress so to protect the national interest is beyond question. *Schenck v. United States,* 249 U. S. 47.

If the petitioner committed acts from which a properly instructed jury could reasonably conclude that the requisite intention existed to cause the evils against which the statute is directed, the sentence was proper. As the verdict was general, we need only to examine the proceedings under the count of the indictment which charged violation of the law in the words quoted in the preceding paragraph. *Hirabayashi v. United States,* 320 U. S. 81, 105.

Petitioner urges that these articles, which contain on their face no explicit call upon the military to disobey orders, act in a disloyal manner, mutiny or disregard their duty, cannot be a violation of the statute because they offer no proof of the necessary intent and none is offered

outside of the papers themselves. We think that this argument fails. Congress has made it an offense willfully to attempt to cause insubordination and likewise willfully to obstruct the recruiting and enlistment service of the Nation. It does not commend itself to us to hold that thereby Congress was merely concerned with crude attempts to undermine the war effort but gave free play to less obvious and more skillful ways of bringing about the same mischievous results. Papers or speeches may contain incitements for the military to be insubordinate or to mutiny without a specific call upon the armed forces so to act. If circulated for the purpose of undermining military discipline, scurrilous articles, attacking an ally, a minority of our citizens and the President, may contain, without words of solicitation, indications of purpose sufficient, if accepted as true, from which to draw an intent to accomplish the unlawful results.

Moreover, when the other evidence is added to the articles themselves, we think that enough facts revealing the requisite intent were presented to justify the verdict. Other similar articles circulated prior to the declaration of war tended to show a continuing intention. The articles which were the basis of the indictment were sent to military officers including those of the highest rank. This circumstance is brought forward by petitioner as indicative of a lack of intention to undermine the military forces. This was doubtless weighed by the jury, but certainly it cannot be said that circulation of propaganda among officers shows less intention to proselyte than to circulate among the enlisted personnel. Copies were sent to the Infantry Journal, a publication circulating largely in the armed forces. Nothing appears as to any motive, other than interference with discipline, that the petitioner might have in distributing this type of pamphlet to professional military officers. The jury was entitled to weigh the fact that the articles were sent anonymously. The

jury was also entitled to weigh the fact that those to whom the articles were sent were hand-picked and composed a select group. These actions speak as loud as words.

Hartzel himself, moreover, made a statement which was introduced at the trial. In it he told of the preparation of the pamphlets, the selection of the mailing list from among prominent personages and associations and his reason for his acts. His intent appears in these words:

"Finally, the prime motive which impelled me in writing and distributing the articles discussed above, was the hope that they might tend to create sentiment against war amongst the white races and in diverting the war from them, to unite the white races against what I consider to be the more dangerous enemies, the yellow races."

The jury might well infer from the quoted paragraph that Hartzel, by placing these pamphlets in military hands, was attempting to cause insubordination among the troops. He sought to develop sentiment "against war among the white races." Germans are a "white race."

These pamphlets were distributed in 1942. The military situation was then nothing like so strong as now nor confidence in our strategy so uniform. A large segment of public opinion desired to concentrate against Japan, rather than Germany and Italy, a viewpoint which doubtless had advocates among the members of the armed forces. It was an opportune time from the viewpoint of the German enemy to put pamphlets such as these in circulation which taught suspicion of Britain, vilified Jews and promoted lack of confidence in the President. On the question of intention, the circumstances under which the pamphlets were distributed were important and entitled to weight. Petitioner played precisely upon those prejudices from which at that time insubordination or disloyalty was most likely to develop.

We are not a jury passing on Hartzel's state of mind. Our sole and very limited duty is to decide whether there

was evidence enough warranting the trial judge letting the case go to the jury, whether 12 jurymen had warrant for their finding that Hartzel's very purpose was to undermine the will of our soldiers to fight our Nazi enemy, and whether the Circuit Court of Appeals was warranted in sustaining such a finding. We are at a loss to know what other intent is to be attributed to the dissemination of these documents to our soldiery. To adopt the language of Mr. Justice Holmes speaking for a unanimous Court in *Schenck* v. *United States,* 249 U. S. 47, 51, of course the documents would not have been sent unless they had been intended to have some effect, and we do not see what effect they could be expected to have upon persons in the military service except to influence them to obstruct the carrying on of the war against Germany when petitioner deemed that a betrayal of our country.

As the trial judge aptly stated:

"All of the circumstances of the case, it seems to me, the very language of the pamphlets composed and distributed by Hartzel show such intent. For what purpose other than hindering the carrying on of the war in any way did he have or could he have had in mind? He appeared on the stand to be an unusually shrewd person. The story he tells of his education and his activities indicates that whatever he does is deliberate and with a definite purpose. He is not a fanatic attached to a cause, having political and economic theories for the liberation of oppressed peoples as were the defendants in *Pierce* v. *United States,* 252 U. S. 239, and *Abrams* v. *United States,* 250 U. S. 616, where Justices Holmes and Brandeis in dissenting opinions found that the literature distributed by the defendants had as its purpose propagating certain economic ideas rather than interfering with enlistment or recruiting or insubordination or disloyalty to the army. In this case the jury were warranted in presuming from the preparation and circulation of the literature that Hartzel intended

to obstruct enlistment and recruiting and to cause insubordination and disloyalty in the military service of the United States."

On these facts we would intrude on the historic function of the jury in criminal trials to say that the requisite intent "to cause insubordination, disloyalty, or refusal of duty, in the military or naval forces" was lacking. The right of free speech is vital. But the necessity of finding beyond a reasonable doubt the intent to produce the prohibited result affords abundant protection to those whose criticism is directed to legitimate ends.