## UNITED STATES v. DE LORENZO.
### No. 301.

Circuit Court of Appeals, Second Circuit.

Aug. 13, 1945.

CLARK, Circuit Judge, dissenting.

———◆———

Ernest Cuneo, of New York City (Ernest Cuneo, of New York City, and Leo Gitlin, of Washington, D. C., of counsel), for Thomas V. De Lorenzo, defendant-appellant.

John F. X. McGohey, U. S. Atty., of New York City (Thomas F. Murphy, Asst. U. S. Atty., of New York City, of counsel), for plaintiff-appellee.

Before SWAN, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The defendant was a member of the United Automobile Workers C.I.O. and was employed by the Aircraft Division of the Union. In the early part of the year 1943 he was requested by certain C.I.O. labor members of the National War Labor Board, who were leaders of C.I.O., to accept a designation as a C.I.O. labor representative on a dispute panel of the New York Regional War Labor Board.

The National War Labor Board was organized at the request of the President of the United States and was composed of representatives of industry, of labor and of the public. The labor members consisted of representatives of the C.I.O. and the A.F.L. labor unions. The National Labor Board, in order to decentralize its activities and thus somewhat to lessen its own burdens, established tri-partite Regional War Labor Boards to assist in the settlement of disputes. The regional boards established dispute panels to sit in particular cases, consisting of representatives of industry, labor and the public. The labor representatives appointed to those dispute panels consisted of members of C.I.O. and A.F.L. unions. The C.I.O. union members sat as labor representatives on dispute panels that acted in settlement of disputes between C.I.O. unions and employers. The nomination of a labor representative to a dispute panel was made by a labor member of the National or Regional War Labor Board who belonged to the same union.

The defendant agreed to serve as a C.I.O. labor representative on the dispute panel of the New York Regional War Labor Board which was to hear the dispute between the DeWald Radio Mfg. Corp. and a

C.I.O. union. He received a notice of his appointment in a letter from the Executive Director of the Regional War Labor Board and was also informed through a letter from the Administrative Office that it was necessary for him to fill in answers to the questions in Standard Form 57 (Application for Federal Employment) of the Civil Service Commission, which was enclosed, in order that he might be certified for service by the Commission. On April 26, 1943 he returned the application with his answers and signed and swore to the questionnaire before a notary public.

■ The appointment was to a federal position and it had to be certified to the War Labor Board by the Civil Service Commission in order to become effective. There was some evidence before the trial court that certification was not thought by the appointing authorities to be necessary but it was necessary as a matter of law. Sections 631 and 631-a of Title 5, United States Code Annotated; Executive Orders Nos. 7915, 9017, 50 U.S.C.A.Appendix § 1507 note. The latter order which created the War Labor Board contains no exceptions affecting the position we are dealing with and the former order provides that the classified civil service "shall include all positions now existing or hereafter created by legislative or executive action, of whatever function or designation, whether compensated by a fixed salary or otherwise, unless excepted from classification by specific affirmative legislative or executive action."

The letter and accompanying application for employment which DeLorenzo filled out indicated not only that he was subject to certification by the Civil Service Commission but that he was aware of that fact.

■ In Question 15 the applicant was asked: "Have you ever been arrested or summoned into court as a defendant or indicted or convicted or fined or imprisoned, or placed on probation * * * ? If so list all cases without any exception whatsoever, under item 45 * * *." He answered under item 45 as follows: "Received summons and tickets for traffic violations in N.Y.C. in last 4 or 5 years and either paid fine or received suspended sentence." In a stipulation at the trial it was admitted (1) that on March 15, 1933, he was arrested by the New York Police and charged with disorderly conduct; (2) that on December 16, 1933, he was arrested by the New York Police charged with homicide by vehicle; (3) that on or about July 17, 1941, he was arrested in Hackensack charged with inciting a riot and malicious mischief; (4) that on or about December 2, 1941, he was indicted by the grand jury of Bergen County, New Jersey, for malicious mischief. The stipulation stated that the answers to Question 15 were untrue in that the facts set forth in items 1, 2, 3 and 4, supra, were not included. The defense on the merits to the evasions in answering Question 15 was chiefly that the four charges brought against the defendant in New York and New Jersey had been dismissed, that they were irrelevant in respect to his fitness as a labor representative on the dispute panel and finally that he believed that he was validly appointed irrespective of any action of the Civil Service Commission. He contends that under all the circumstances he could not have intended to make wilful misstatements. But the question of his intent was for the trial court. He had been informed that it was necessary for him to supply the information required by Form 57 and when he gave false answers it was reasonable to infer wilfulness from the falsity of the statements.

In question No. 37 the applicant was asked to furnish "a record of every employment both public and private which you have had since you first began to work." In answering he said that he was employed by Seversky Aircraft at Farmingdale, Long Island, between January, 1935 and July, 1939. But, according to the stipulation furnished at the trial, he was at no time employed by that company. His defense for his untruthful answer to Question No. 37 was similar to the one made in regard to Question No. 15.

■ It cannot be said that the questions asked were irrelevant. Those in both 37 and 15 bore on his social conduct and on his qualifications. The objection to the jurisdiction of the Civil Service Commission to make such inquiries seems to us wholly unsubstantial.

■ The defendant was indicted for violating Section 80 [1] of Title 18 of the United States Code Annotated by making a false

---

[1] "§ 80. Presenting false claims; * *
"Whoever shall make or cause to be made or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, or any

affidavit, knowing it to contain fraudulent and fictitious statements, in a matter within the jurisdiction of the United States Civil Service Commission. He was convicted after a trial before the court without a jury, which he had waived in writing. His chief defense was a claim of immunity under the Fifth Amendment of the Constitution from prosecution for false statements made in his affidavit before the Civil Service Commission. He claimed immunity because he had testified under compulsion before the sub-committee of the Committee on Naval Affairs of the House of Representatives that the statements in his affidavit were false. While he could not have been compelled by the Congressional Committee to give testimony which might show that he had made false statements in his application for employment, if he had asserted constitutional immunity on the ground that the answers might tend to incriminate him, he never claimed immunity on any such ground. Indeed, the only effect of making such a claim if it had not been sustained would have been to render his testimony before the sub-committee unavailable. It would not have afforded him a general immunity from prosecution.

The Fifth Amendment to the Constitution provides: "No person * * * shall be compelled in any Criminal Case to be a witness against himself * * *." It is the contention of the defendant that his testimony before the sub-committee was compelled, that his Constitutional privilege was thereby violated, and as a result that he cannot be prosecuted for any crime he revealed in that testimony.

The applicable statutes are set forth as follows:

Title 2 U.S.C.A. § 192, R.S. Sec. 102:

"Every person who having been summoned as a witness by the authority of either House of Congress * * * refuses to answer any question pertinent to the question under inquiry, shall be deemed guilty of a misdemeanor, punishable by a fine of not more than $1,000 nor less than $100 and imprisonment * * * for not less than one month nor more than twelve months."

Title 28 U.S.C.A. § 634, R.S. Sec. 859:

"No testimony given by a witness * * * before any committee of either House * * * shall be used as evidence in any criminal proceeding against him in any court * * *."

*No Incriminating Testimony Was Compelled Over Claim of Privilege.*

The record before the sub-committee shows that the defendant did not give incriminating evidence under compulsion over claim of privilege. In reply to a question to the chairman as to whether he might refuse to answer questions and "if I do, what the penalty may be," the chairman said: "* * * I doubt very much whether you could refuse to answer on the ground that it would incriminate you, because you are not charged with a crime as far as this committee is concerned. You are simply asked to give your views, the information that you have about conditions at these plants. You are not on trial. We are not attempting to convict you of anything. It is just a question of getting information from you, as we have gotten from all the other witnesses that have come, so that I don't think you could put it on the ground of incriminating you, but so far as I am personally concerned as chairman of this committee, I would rule that if any questions were asked you that you thought would incriminate you in a criminal proceeding and might tend to prove your guilt, I would say that so far as I am concerned I wouldn't care about whether you replied or not. The mere fact of your refusal to do it on that ground would be sufficient evidence for me, but I will rule on that when

department thereof, or any corporation in which the United States of America is a stockholder, any claim upon or against the Government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent; or whoever, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, or for the purpose and with the intent of cheating and swindling or defrauding the Government of the United States, or any department thereof, or any corporation in which the United States of America is a stockholder, shall knowingly and willfully falsify or conceal or cover up by any trick, scheme, or device a material fact, or make or cause to be made any false or fraudulent statements or representations, or make or use or cause to be made or used any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, shall be fined not more than $10,000 or imprisoned not more than ten years, or both."

the question arises. At this time, that is my general attitude. \* \* \* I forgot to say this. You are here under subpoena and I think you cannot avoid answering questions. You have to answer the question with reference to the matter for which you are brought here."

It thus appears that the chairman told DeLorenzo that he could not refuse to answer on the ground of incrimination, but also told him that if he declined to answer upon that ground he would not be forced to answer. Thus he was informed that he would not be compelled to answer if he claimed his privilege as to any question, but he did not see fit to do this. He was not a confused witness nor an intimidated witness; at several points he objected to questions on the ground that they were not pertinent to the inquiry, and once he flatly refused, on that ground, to answer a question even when the chairman told him he must, saying that he would decline to answer and "take my chances." Volume 4, Brewster Investigation, Report of Hearings before the Subcommittee of the House Committee on Naval Affairs, page 3012, in evidence as Exhibit H. He did consent to answer privately, saying: "On advice of counsel. He says I should, so I will." It thus appears that he was advised by counsel at the hearing. Accordingly there is no basis for any contention that he may not have understood that the chairman would not press him to answer if he claimed his privilege, or that he was not advised as to his legal rights. It plainly appears that he was not compelled to give incriminating testimony over a claim of privilege.

*No Immunity Conferred.*

It is argued that under the decision of Counselman v. Hitchcock, 142 U.S. 547, 12 S.Ct. 195, 35 L.Ed. 1110, the defendant, if he was compelled to testify, received complete immunity from prosecution. In our opinion that decision involved no such doctrine. It merely held that compulsion of a witness to testify against himself before a grand jury violated the privilege granted to him under the Fifth Amendment. Section 860 of the Revised Statutes provided that: "No \* \* \* evidence obtained from a party or witness \* \* \*, shall be given in evidence, or in any manner used against him \* \* \*, in any court of the United States, in any criminal proceeding." Section 860, supra, was held to be insufficient protection to justify the compelling of evidence, because it did not af-

ford complete immunity, Blatchford, J., observing in the opinion that the section "affords no protection against that use of compelled testimony which consists in gaining therefrom a knowledge of the details of a crime, and of sources of information which may supply other means of convicting the witness or party." Upon presentment of the witness by the grand jury for contumacy in failing to answer questions as to which he had claimed his constitutional privilege, he had been adjudged in contempt by the Circuit Court and committed to the custody of the marshal. The Supreme Court sustained his claim of privilege and ordered him discharged. The decision amounted to no more than a ruling that the compulsion of the witness violated the Fifth Amendment and that the order of commitment for contempt was therefor unlawful. It did not hold that if he had under compulsion answered the question asked him he would have obtained a general immunity, but only that, in view of the Fifth Amendment, immunity had to be given before answers could be legally compelled. It was implicit in the decision that answers illegally compelled could not be used against him in a criminal prosecution, either as direct proof or by way of a "lead." Nothing in the opinion of Justice Roberts in United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376, contravenes what we have said; indeed his statement at page 428 of 317 U.S. at page 411 of 63 S.Ct., as to Counselman v. Hitchcock is entirely consistent with our conclusion.

The remarks of Justice Van Devanter in McGrain v. Daugherty, 273 U.S. 135, 168, 47 S.Ct. 319, 326, 71 L.Ed. 580, 50 A.L.R. 1, quoted by the defendant's counsel in their brief, were not only completely obiter dicta, but even as dicta amounted only to a statement that Section 859 of the Revised Statutes, 28 U.S.C.A. § 634, prevented testimony given by a witness before a committee of either House of Congress from being used as evidence in any criminal proceeding against him where he made no claim of constitutional immunity. See Burrell v. State of Montana, 194 U.S. 572, 577, 578, 24 S.Ct. 787, 48 L.Ed. 1122.

In re Chapman, 166 U.S. 661, 17 S.Ct. 677, 41 L.Ed. 1154, is not relevant in the case at bar. Under the facts of that case no attack upon the constitutionality of the statute on the ground that the privilege against self-incrimination had been violat-

ed could be made in the Supreme Court because no objections to testimony on that ground had been made at the trial. The opinion so stated at page 666 of 166 U.S., at page 679 of 17 S.Ct., 41 L.Ed. 1154, and the question was expressly laid aside.

*Evidence Was Not Derived from Defendant's Testimony.*

No attack has been made by the defendant upon the judgment of conviction on the ground that it was based on evidence derived from his statements before the Congressional Committee. Indeed, we think such an attack would necessarily fail because the government's proof of the falsity of his affidavit was based wholly on the defendant's stipulation. Moreover, it appears from Exhibit H that Congressman Hébert was aware of the false answers to questions 15 and 37 in the application which the defendant had given to the Civil Service Commission. It also appears that he was familiar with the details of the first three arrests referred to in the indictment. The information this Congressman gave to the committee by reason of the questions which he asked the defendant, rather than the latter's answers, is the source of any knowledge as to these matters which the public prosecutor might have gleaned from the record before the committee. It seems clear that the basis of the prosecution was not the testimony of the defendant before the committee, but the statements of Mr. Hébert made in the course of its investigation. See Ex. H pp. 3015, 3016. At the trial the defendant evidently preferred to stipulate facts showing the falsity of the answers in his application for employment to having evidence introduced by the government derived from the facts disclosed by Mr. Hébert and the court records of the defendant's arrests which he had not disclosed in his application for employment.

While a letter from the chairman of the Congressional Committee referring to disclosures before the committee doubtless gave rise to the present prosecution, the disclosures were not found in the defendant's answers, but in the statements of Congressman Hébert in questioning him.

For the foregoing reasons the judgment is affirmed.

CLARK, Circuit Judge (dissenting).

Several things about this conviction are troublesome. First I think it clear from the published transcript furnished as an exhibit here (Exhibit H, supra) that defendant was compelled by the congressional committee to make admissions of the facts essential to this later criminal proceeding. At the outset of his testimony before the committee he sought specific information as to his rights, including the "penalty" for refusing to answer, since he had never been "in front of a committee of this sort." And the chairman then proceeded to enlighten him in a lengthy statement, of which much is quoted in the opinion, supra, wherein he was told specifically that he was under subpoena and could not avoid answering questions. The chairman also said that "this is not a court of law"; and hence he doubted if the witness could refuse to answer on the ground of self-incrimination, since no crime was charged, though he (the chairman) personally would not press him, as "the mere fact" of refusal to answer "would be sufficient evidence for me."

The minatory nature of this statement alone seems to me obvious. But the chairman later made the compulsion quite definite during that part of the examination, conducted by another congressman, which is here crucial. This further admonition —not cited in the opinion, but quoted in the margin here—[1] was described by the

---

[1] The questions had been directed to the witness' use of other names and had veered to the suggestion of impersonation of one Sidney Traurig, that being a name used by the witness. Then this occurred (Exhibit H, p. 3012):

"Mr. Hébert. Then you weren't impersonating that man?

"Mr. DeLorenzo. I don't believe I was.

"Mr. Hébert. What was the occasion for using his name?

"Mr. DeLorenzo. I would like to refuse to answer that question.

"The Chairman. I don't think, Mr. DeLorenzo, that you have the right to refuse to answer that question. You must an-

swer anything that goes to the credibility of the witness, and this certainly does.

"Mr. DeLorenzo. Does this have anything to do with the production at Brewster? `

"The Chairman. I now have before me the law. When this point came up before, I didn't have the law before me, but since it has come up again, I am going to read from the law: [Reading in full first the statute making refusal to testify before a congressional committee a crime, 2 U.S. C.A. § 192, supra, and then the statute forbidding use in evidence of the testimony given, 28 U.S.C.A. § 634, supra.]

"So I think, sir, that you are called upon

---

chairman as a clarification or revision of what he had first said, since he did not have the law before him when the point first came up. And it led to a specific order to the witness to answer a definitely incriminating question. It was then that defendant agreed to answer privately, but added, " * * * if you insist upon my answering it here, I will have to simply refuse to answer it and take my chances," showing thereby that he understood the compulsion and its consequences, not the opposite as the opinion suggests. In fact he did answer the question privately, where-upon the chairman stated its general tenor for the record.[2] Then the questions and answers containing the admissions here important followed almost at once.

Moreover, the entire hearing—indeed the earlier hearings to which this was somewhat of a climax—is instinct with an intent upon the part of the examiners to demonstrate from his own mouth the evil character of this rebellious labor "dictator" who in their eyes was the cause of a serious lag in the production of navy fighter planes.[3] The witness, unlike an accused in a court of law, had no option to refuse to take the stand; and it is neither feasible nor fair to expect him to object to every question, notwithstanding compulsion thus direct. His chance reference to "counsel" does not identify any person at the hearing or show what, if any, protection he got or could get from such a quarter. Obviously all that any counsel could wisely tell him was that he must answer as the committee demanded and rely upon the immunity which the law gave him against any further consequences.

Next, if I understand the opinion correctly, it employs a view of immunity, even where gained, as applying only to the use of the actual testimony itself, a view which I had supposed was just what was repudiated in Counselman v. Hitchcock, 142 U.S. 547,

12 S.Ct. 195, 35 L.Ed. 1110, and in all the cases since, e. g., United States v. Monia, 317 U.S. 424, 428, 432–434, 63 S.Ct. 409, 87 L.Ed. 376; McGrain v. Daugherty, 273 U. S. 135, 168, 47 S.Ct. 319, 71 L.Ed. 580, 50 A. L.R. 1; McCarthy v. Arndstein, 266 U.S. 34, 45 S.Ct. 16, 69 L.Ed. 158; Glickstein v. United States, 222 U.S. 139, 32 S.Ct. 71, 56 L.Ed. 128; Brown v. Walker, 161 U.S. 591, 16 S. Ct. 644, 40 L.Ed. 819. Such a limited immunity does not satisfy the Fifth Amendment which protects an individual from giving evidence only *tending to criminate* himself, and applies to testimony which may merely furnish the background which leads to the ultimate conviction. And a statute is not adequate unless it grants *complete* immunity, "in all respects commensurate with the protection guaranteed by the constitutional limitation." Glickstein v. United States, supra, 222 U.S. 139, 141, 32 S.Ct. 71, 72, 156 L.Ed. 128. Hence it is no answer to say that the examiner had a background of facts sufficient to justify prosecution before he began his examination. In fact the examination was directed to procuring the witness' admissions and was successful in so doing—so much so that the chairman of the main committee immediately sent a transcript thereof to the appropriate prosecuting authorities with a strong request for prosecution, a request vigorously reiterated in the committee's final report. Admissions are, after all, the most convincing of evidence; at any rate they appear to have led here, perhaps almost inevitably, to the stipulation wherein the defendant conceded facts upon which the judge below based his finding of guilt of willful intent to defraud a governmental department.

Hence it does not seem to me that the application of the constitutional protection should be at all equivocal here. For this involves not only an important question of personal liberties, but also one going to the

___

to answer the question that Mr. Hébert has asked you. He asked you why, as I understood the question, you impersonated a man who was then living and within your knowledge and a member of your union, why you impersonated him and under what conditions and circumstances you did so. I think that is pertinent to the inquiry."

[2] After the witness had given his answer to the committee privately, the chairman, thanking him for his co-operation, continued, " * * * and your reply generally would be that you did it for personal reasons, is that right?" to which the wit-

ness answered, "That is correct, sir." This was followed by questions and answers bringing out that he had used other names for business reasons. Exhibit H, p. 3013.

[3] In view of all this, it is somewhat odd that at the afternoon session and after the damage had been done, the examining congressman told the witness he might rely upon his privilege against self-incrimination. Exhibit H, p. 3023. The probable explanation is a very real and justifiable confusion as to the meaning of the statutes (discussed below in this opinion); perhaps, too, there were differing views of interpretation within the committee itself.

heart of the valuable investigative functions of Congress. It is to the public interest that the power to investigate be unhampered and that witnesses be induced, indeed forced, to testify with the complete protection which satisfies the constitutional intent, rather than be allowed to remain silent in reliance upon their constitutional prerogatives. It is desirable, therefore, that the statutory provisions be construed, if possible, to contain such immunity, rather than be held insufficient, with the privilege of refusing to testify then freely operative. There are difficulties in such interpretation, it is true, arising out of the history of the legislation; the situation is one where clarification must await the decision of the highest court.[4] But for present purposes we need not decide finally whether the statutes are complete or not; for the force of the constitutional principle alone requires us to set aside a conviction based upon facts a witness was compelled to admit on his congressional examination.

There are other disquieting problems suggested by this record: the extension of civil service principles to this very limited and temporary job (at $10.55 per day for some 11 or 12 days) which the union people viewed more as labor representation on an arbitration panel than federal office-holding; the extension of the federal false-claim statute, 18 U.S.C.A. § 80, to cover a form of application for such a job; the further necessary conclusion—to be assumed even though the judge made no specific finding or detailed analysis of the evidence—of willful intent to defraud, that

is, of the evil purpose requisite under such statutes, as stated in Hartzel v. United States, 322 U.S. 680, 64 S.Ct. 1233, 88 L. Ed. 1534, and other cases cited at pages 686, 687, at pages 1236, 1237, of 64 S.Ct., in spite of the undisputed evidence that the labor members of the War Labor Board, fully acquainted with the defendant's background here in issue, persuaded him against his own desires to take the job because most union leaders could not afford to do so and that his appointment was fully settled before the form was even called to his attention; and, possibly most important, the emotional background from which the demand for his prosecution stemmed. The committee members were aroused by this defendant's iron control of some 18,-000 workers in opposition to the war needs and aims, as they viewed the situation; but however righteous was their anger on the main issue, the removal of this key labor figure through the route of imprisonment and fine for a collateral and profitless offense seems a somewhat doubtful method of securing labor co-operation in production, while it does jeopardize vitally necessary public confidence in the nonpartisanship of courts of justice. But the policy behind a prosecution cannot well be reviewed on appeal from a conviction; nor am I prepared to say that the judge erred as a matter of law in his conclusion of willful guilt or that my brothers are wrong in their legal conclusions on these latter issues. Consequently I limit my vote for reversal of the conviction to the first ground I have discussed above.

[4] 28 U.S.C.A. § 634 (together with 2 U. S.C.A. §§ 192–194) was originally passed in 1857, 11 Stat. 155, 156, and then contained a broader provision of immunity from prosecution for matters testified to, which was stricken in 1862, 12 Stat. 333, as set forth in Re Chapman, 166 U.S. 661, 666, 17 S.Ct. 677, 679, 41 L.Ed. 1154, note. That change does tend to support the government's argument as to the legislative intent, but the congressional debate on the amendment, particularly in the Senate and the remarks of Senator Sumner and others, shows a conception of the constitutional privilege quite contrary to that established in 1892 in the Counselman case; indeed, specific incorporation of the constitutional privilege in the statute was rejected by vote of 19 to 21. See 42 Cong. Globe 364, 428–431, 1862. Moreover, after the Counselman decision, the Court, in Re Chapman, supra, upheld the constitutionality of 2 U.S.C.A. § 192, making refusal to testify a crime; and finally, after the various cited constitutional decisions, Congress re-enacted the legislation with only minor changes in 1938, 52 Stat. 943, 2 U.S.C.A. § 192—thus perhaps suggesting a statutory interpretation consistent with, rather than opposed to, constitutional principles.