Bryan CLEMMONS, Wingate White, and John Christian, the Latter in His Official Capacity as Mayor-President, and as Such Mayor of the City of Baton Rouge, Louisiana, Plaintiffs,

v.

CONGRESS OF RACIAL EQUALITY, John Doe, and Mary Doe, Defendants.

No. 624.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Feb. 2, 1962.

R. Gordon Kean, Jr., Parish Atty., John V. Parker, Asst. Parish Atty., Sargent Pitcher, Jr., Dist. Atty., John F. Ward, Jr., Asst. Dist. Atty., Baton Rouge, La., for plaintiffs.

Johnnie A. Jones, Baton Rouge, La., for defendants.

WEST, District Judge.

This suit, seeking injunctive relief, was initiated by Bryan Clemmons, Sheriff of the Parish of East Baton Rouge, Louisiana, Wingate White, Chief of Police of the City of Baton Rouge, Louisiana, and John Christian, Mayor-President of the City of Baton Rouge and Parish of East Baton Rouge, State of Louisiana, as plaintiffs, against the Congress of Racial Equality, a New York corporation, hereinafter referred to as CORE, and John Doe and Mary Doe, nominal parties, described as "residents of states other than Louisiana", as defendants.

The plaintiffs' complaint alleges, in essence, that CORE and others associated with it, are sponsoring, financing and encouraging John Doe and Mary Doe and others to come into Baton Rouge to ferment violence, to provoke breaches of the peace, and other law violations; that such actions on the part of the defendants and others acting in concert with them, have caused large numbers of people to congregate on the public streets and ways, contrary to the laws of the State of Louisiana; that defendants, and those acting in concert with them, have obstructed and blocked certain public streets and ways such as to deny and deprive plaintiffs and others for whom plaintiffs are responsible, of their civil rights, including the right to freely use said streets and ways, and their right to unimpaired and unhampered ingress and egress to public and private buildings in the area; that these actions on the part of the defendants have unlawfully interfered with the plaintiffs in the performance of their official duties and have unlawfully prevented the plaintiffs, as public officials, from giving or securing to all persons in the City and Parish the equal protection of the laws, including the equal right of all citizens to use the public ways and streets of the City of Baton Rouge and the Parish of East Baton Rouge, Louisiana, all in violation of the State Statutes hereinafter referred to, and in violation of Title 42 U.S.C.A. § 1985(3); that such actions on the part of the defendants constituted a conspiracy for the purpose of restraining trade in violation of Title 15 U.S.C.A. § 1; that plaintiffs have no adequate remedy at law, and therefore injunctive relief is sought.

Defendants, in their answer, admit the jurisdiction of this Court as alleged by the plaintiffs, and further seek to invoke its jurisdiction pursuant to Title 28 U.S.C. § 1331; Title 42 U.S.C. § 1983; Title 42 U.S.C.A. § 1981; and Title 28 U.S.C. § 2281. Defendants deny "for lack of sufficient information to base a belief" all material allegations of the plaintiffs' complaint as written, and then admit that they, defendants, did in protest of racial segregation laws, customs, and usages, picket twelve stores which were referred to in the plaintiffs' complaint, urging persons in sympathy with their cause to refrain from patronizing those stores; they then allege that certain of the defendants who were picketing these stores were arrested and placed in jail for al-

leged violation of the Louisiana Statutes hereinafter referred to, which arrests, defendants allege, violated their right to freedom of speech as guaranteed by the First Amendment to the United States Constitution, and was contrary to the due process and equal protection provisions of the Fourteenth Amendment to the United States Constitution. Defendants further allege that they did "peaceably assemble in protest of racial segregation" in accordance with the rights of assembly afforded to all citizens by the First Amendment to the United States Constitution, and that they, the defendants, did publicly announce that they intended to continue to so assemble and protest in the future. Then, by counterclaim, the defendants allege that the activities in which the defendants were engaged on December 11, 12, 13, 14, and 15, of 1961, were not criminal in nature, nor did those activities contemplate criminal activities on the part of the defendants, and that therefore, the activities engaged in by the defendants on those days were not embraced within the terms and meanings of LSA–R.S. 14:59; 14:-63.4; 14:92; 14:100.1; 14:103; and 14:103.1; and that the application of these laws to the activities of the defendants, including the arrest of the pickets, constituted a violation of their constitutional rights as guaranteed by the First and Fourteenth Amendments to the United States Constitution. Defendants pray that the plaintiffs' demands for injunctive relief be denied, and that instead, an injunction issue against the plaintiffs, enjoining the plaintiffs from disturbing the defendants in the exercise of their alleged constitutional rights of freedom of speech and assembly, and further enjoining the plaintiffs from applying or enforcing the provisions of the Louisiana Statutes above mentioned to the activities of these defendants.

Upon the application of the plaintiffs, and the Court being of the opinion that the plaintiffs had no adequate remedy at law, and that immediate and irreparable injury or damage was imminent, a temporary restraining order was issued by this Court on December 15, 1961, restraining and enjoining the Congress of Racial Equality and John Doe and Mary Doe, and each of them, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from continuing to sponsor, finance, or encourage unlawful picketing in the City of Baton Rouge, from engaging or participating in any unlawful congregating or marching in the streets or other public ways of the City of Baton Rouge, Louisiana, from conspiring, encouraging, or participating in any boycott in restraint of trade, or from doing any other act designed to provoke breaches of the peace, or from doing any act in violation of the provisions of LSA–R.S. 14:59; 14:63.4; 14:92; 14:100.1; 14:103; 14:103.1, as well as Title 42 U.S.C.A. § 1985, and Title 15 U.S.C.A. § 1 et seq. This restraining order was then renewed on December 22, 1961, and after a hearing, on January 5, 1962, a temporary injunction in the form and substance of the temporary restraining order was issued pending this hearing on the merits. A full hearing on the merits of plaintiffs' application for the issuance of a permanent injunction was held on January 11 and 12, 1962. During the trial of this case, the defendants did not choose to produce any witnesses or introduce any evidence of any kind. All of the facts, as hereinafter determined by this Court, resulted from evidence adduced at the trial of the case by the plaintiffs, and the cross-examination by defendants' attorneys of the witnesses produced by the plaintiffs. At the conclusion of the presentation of the plaintiffs' evidence, the defendants announced that they rested their case solely and entirely on the examinations and cross-examinations of plaintiffs' witnesses. From the evidence taken at the trial of this case, the Court now makes the following findings and conclusions, which shall be considered as its findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Some time shortly prior to December 8, 1961, the following letter was directed to and received by some twelve merchants and department stores in the City of Baton Rouge, Louisiana:

"Dear Sir: We have made several attempts by telephone to make appointments to negotiate with you in regard to securing equality in employment and desegregation of facilities for all citizens. We want to negotiate, but promptness, cooperation, and action are essential pre-requisites in order to achieve racial equality through negotiation.

"In spite of the busy Christmas season, it is necessary that we confer with you in person by Saturday, December 9, 1961, before 12:00 noon. We realize that Christmas is a busy season for buying and selling.

"If you cannot manage to arrange a personal conference before or on the deadline, kindly inform us as to your intentions. We hope that you will take immediate action in meeting the aforesaid ends. In good faith, we submit our grievances and request satisfaction.

"Sincerely yours,

EXECUTIVE COMMITTEE OF BATON ROUGE CHAPTER OF CONGRESS OF RACIAL EQUALITY"

At approximately the same time, CORE, through its members and representatives, distributed circulars or handbills urging Negroes to refuse to patronize the twelve stores listed thereon until those stores afforded "better job opportunities" to the members of the Negro race, and until these stores desegregated all of their various facilities. Also, on December 8, 1961, and December 9, 1961, CORE sponsored a "clinic" in Baton Rouge, Louisiana, billed in their notices as "Direct Non-Violent Action Clinic". On the program for the clinic was such items as "workshops" in (1) sit-ins, (2) picketing, (3) freedom rides, (4) voter registration, (5) jail discipline, (6) discrimination of job opportunities, (7) hit and run demonstrations, (8) selective buying, and (9) reports of various groups involved in demonstrations.

On December 11 and 12, 1961, following this clinic, pickets were established in front of the several stores to whom the letters previously referred to had been directed. These pickets were members of the Negro race, and were apparently acting in accordance with instructions received from the leaders and representatives of CORE at the clinic held on December 8 and 9, 1961. They carried signs urging that the stores be boycotted because of their alleged discrimination against members of the Negro race. On Wednesday, December 13, 1961, these pickets were advised by officers of the Police Department of the City of Baton Rouge and/or by deputies of the Sheriff's Department of the Parish of East Baton Rouge that they were in violation of certain State Statutes, and that continued violations of these statutes would result in arrest and prosecution. On the following day, December 14, 1961, the pickets continued their activities, despite the warnings of the Police Department and/or the Sheriff's Department, and the arrest and incarceration in the parish jail of some twenty-three pickets followed.

It was apparently the arrest of these pickets that brought about the mass demonstration which occurred in the City of Baton Rouge, Louisiana, on December 15, 1961.

On the night of December 14, 1961, through unofficial sources, the Police Department and the Sheriff's Department learned that a large congregation of Negro people were to march from Scotlandville, Louisiana, north of the City of Baton Rouge, Louisiana, into the City of Baton Rouge, a distance of some four and one-half miles, to demonstrate against the arrest of the pickets who were incarcerated in the Parish jail located atop the Courthouse Building in the very heart of the city. At about 9:00 o'clock a. m. on the morning of December 15, 1961, students from Southern University, an all-Negro university located in Scotlandville, Louisiana, and others, went to a church building close to the university campus where they congregated for approximately 30 to 40 minutes. This

congregation of Negroes under the direct control and supervision of officers, members, or representatives of CORE, then started their march to Baton Rouge, some four and one-half miles away. They marched down the main highway to Baton Rouge, and at times completely blocked the street to vehicular traffic. The police officers on duty in the area used public address systems to request the crowd to clear the highway. The requests were apparently ignored and the street was blocked to traffic for approximately 15 minutes. The crowd consisted of about "two blocks of people", but the witnesses could not estimate the number of persons participating at this stage of the demonstration. After about fifteen minutes of marching, and apparently ignoring police requests to clear the highways, an individual identified as Rev. B. Elton Cox inquired of one of the police officers present as to the proper procedure for his followers to use in their march to Baton Rouge. He was informed by the officer that it was a violation of Louisiana law for the marchers or demonstrators to obstruct the road or highway and that they must stay on the shoulders of the highway, leaving the highway clear for use by other traffic. Cox was identified by every witness who testified as an officer and leader of CORE, and he was further identified as a resident of the State of North Carolina. While the crowd completely ignored instructions given to them by the police officers, they apparently obeyed all orders given them by Cox. When they marched through intersections, it was necessary for police officers to manually operate the traffic lights in order to avoid accidents as the marchers refused to heed these traffic signals. However, after they reached a point within about one mile of the center of Baton Rouge, and upon instructions from Cox, the marchers began to obey the traffic lights and wait for the proper signal before crossing intersections. At one point during the march to Baton Rouge, there were five white men who attempted to block the path of the marchers, and they were immediately dispersed by the police officers in order to avoid any incident be-

tween the white men and the marching demonstrators. This march from Scotlandville to Baton Rouge took approximately two or three hours to complete.

The marchers were apparently divided into "squads", with each squad having a leader who gave orders. Each of the leaders wore "overseas" caps with the word "CORE" written on each side, and these "squad leaders" took their orders and instructions directly from Cox. The uncontradicted testimony shows that these demonstrators refused to take orders from the police and refused to follow police instructions, but that they apparently obeyed implicitly the orders or instructions given them by their squad leaders or by Cox.

Neither the officers or representatives of CORE, nor any of the demonstrators, made a request of the Police Department or of the Sheriff's Department for a permit to hold a parade or to stage a demonstration as is required by an ordinance of the City of Baton Rouge. Despite this fact, at no time during this march from Scotlandville to Baton Rouge, Louisiana, did the Police Department or Sheriff's Department or any other State, City, or Parish official attempt to interfere with the demonstrators or to break up their parade. During this entire march, according to the unrefuted testimony, the only request made by the police officers of the demonstrators was that they not block the highways or sidewalks in violation of existing statutes and ordinances of the State of Louisiana, the Parish of East Baton Rouge, and the City of Baton Rouge.

John Christian, the Mayor-President of the City of Baton Rouge and Parish of East Baton Rouge, testified that when he heard of this pending demonstration, he specifically instructed the Chief of Police and the Sheriff to provide all available protection to the marchers and demonstrators so long as their activities were orderly and lawful. He testified that there was no attempt made to prevent the "parade" or the demonstration in any way. However, after the demonstrators reached the downtown area of Baton

Rouge, when it was estimated that there were somewhere between 1,500 and 2,000 people involved, the testimony shows that it was deemed necessary to use all police officers and deputy sheriffs available, including the recalling to duty of some sixty off-duty personnel. All available men from the Police Department and the Sheriff's Office were utilized to control traffic and to look out for the safety of the people involved in this demonstration, as well as other spectators, and that as a result, the rest of the City of Baton Rouge and the Parish of East Baton Rouge, outside of the immediate downtown area, was left virtually without police protection of any kind. The testimony further shows that when these demonstrators congregated in the downtown area, the entire sidewalk for an area of approximately two blocks, was completely blocked to all other traffic, and that ingress and egress to houses or other establishments in the vicinity was completely blocked. The testimony further showed that this crowd of some 2,000 people assembled on the west side of the street by the Courthouse where the jail was located, and that they began singing songs, reciting prayers, and listening to speeches made by Cox, who was, apparently, in complete charge of the entire demonstration. On the opposite side of the road a crowd of 200 to 300 white persons had gathered, and it was the testimony of everyone who testified that the entire situation was "tense with impending violence". When the demonstrators first arrived in the downtown area, Chief Wingate White, of the City Police force, personally conferred with Cox concerning his intentions. He was informed by Cox that these demonstrators wanted to appear before the Courthouse to protest the arrest of the twenty-three pickets and to say the Oath of Allegiance; sing two songs; and that he, Cox, would make a four-minute speech and then they would disperse and go back to the campus at Southern University. Cox advised Chief White that this demonstration would last approximately seven minutes. Chief White then advised Cox that such a demonstration would be permissible so long as it was or-

derly. During the entire demonstration, Cox was apparently in complete control of the crowd. They shouted and yelled at his commands, and they moved and stopped upon his orders. After the demonstrators had sung hymns, prayed and listened to speeches, Cox, according to the uncontradicted testimony of several witnesses, stood up before the crowd and told them that it was lunchtime, and suggested that they all go to the lunch counters in the twelve stores on the "list" and demand to be served. He suggested that if service was denied them, they should refuse to remove themselves from the lunch counters for a period of one hour. It was at this moment, according to the uncontradicted testimony adduced at the trial of this case, that an outbreak of physical violence was almost a certainty. When Cox urged the crowd to sit in at the lunch counters, where, he advised them, he knew that they were "not welcome", the crowd cheered, applauded, and became extremely boisterous, and according to all of the evidence, was fast approaching a "mob reaction". It was shortly after this reaction that the demonstrators were forced to disperse by the use of tear gas fired into their midst by police officers. However, before the tear gas was used, the Sheriff, believing that the situation was about to get out of hand, stood before the crowd using an electric megaphone and identified himself and suggested to the demonstrators that they had been allowed to demonstrate in accordance with their stated intentions, and that since they had been permitted to do everything that they had requested to do, he now felt that it was time for the demonstration to end. He requested them to disperse at that time. However, at this point, Cox stood before the crowd, folded his arms, and shouted to the crowd "Don't move". Whereupon some of the Sheriff's officers began to go toward the crowd as though to force them to disperse. The Sheriff recalled his men and again identified himself with the use of the electric loudspeaker, and again requested them to break up the demonstration and disperse. The testimony shows that Cox again stood before the crowd

and shouted "Don't move" and the crowd did not move. At this point, the Sheriff ordered the police officers to fire tear gas bombs into the crowd. Tear gas was fired into both the colored demonstrators on the west side of St. Louis Street and the white crowd which had congregated on the east side of St. Louis Street, and within less than two minutes the crowd was completely dispersed.

Chief White, who has been in active police work since 1937, testified that it was his considered opinion that there was an immediate danger of an outbreak of physical violence during the demonstrations of this large crowd of people in the downtown area of Baton Rouge on December 15, 1961. Because of the large size of the crowd and the tenseness of the situation, he, and the Sheriff, had recalled all available police officers to duty to cope with the situation and what they believed to be impending dangers. As a result, during the period of these demonstrations, there was practically no police protection of any kind available for the rest of the City of Baton Rouge or the Parish of East Baton Rouge wherein approximately 230,000 people reside.

But even the dispersal of the crowd by the use of tear gas did not end the demonstration. After the crowd was dispersed with tear gas, they again reformed into smaller groups on Third Street, which is the main street in the city, where they remained milling around on the streets and sidewalks for approximately one hour. During this time, practically the entire police force and the personnel of the Sheriff's Department was utilized in the Third Street area in order to prevent any outbreaks of violence following the initial demonstrations. At one time during this latter part of the demonstration, approximately 200 boys of highschool age arrived on the scene dressed in old clothes and giving every indication that they were present to participate in violent activities of some kind. Upon orders from the police, this group of white boys was dispersed, with the exception of one white boy who, upon his refusal to obey the police orders to disperse, was arrested.

Every law enforcing officer who testified in this case, together with every State official who testified, was of the opinion that as this demonstration progressed, and as it reached its climax in the vicinity of the Courthouse, it presented an extremely dangerous situation. There was every evidence of pending danger and violence, and this crowd was on the verge of becoming a mob. As an example, one of the police officers testified that while there was no actual physical violence, nevertheless, during the course of this demonstration, he heard remarks from the demonstrators such as "We ain't leaving for no one", and "We can take 'em", and "There ain't enough of them to stop us". This officer testified that he feared at any moment there might be an attempt by these many demonstrators to overrun and overpower the small force of police officers present.

Mr. James T. Erwin, news director of a local radio station, and Mr. Albert Tonguis, photographer for a local television station, both testified that in their opinion the situation was extremely tense, and they feared an outbreak of violence at any moment. One of these witnesses stated that the situation was "as electric a situation as I have ever seen."

During the Third Street demonstration, following the demonstration at the Courthouse, two large department stores, Kress and McCrory, located on Third Street, found it advisable to close their doors because of the fear of being overrun by demonstrators. Around 8:00 o'clock or 9:00 o'clock that same night, a meeting was held by members of CORE in Scotlandville. A Negro spokesman addressed the crowd at that time and stated "They are dealing with the new Negro. We don't tell you what to do, we do it with you. How many of you are going back downtown with us tomorrow?" Since it seemed apparent that these demonstrations would continue and would be repeated the following day, with all of the attendant possibility of an outbreak of

violence, the plaintiffs requested this Court to issue a temporary restraining order, which was issued on December 15, 1961, and renewed on December 22, 1961, followed by the issuance of a preliminary injunction on January 5, 1962, as hereinbefore set forth.

During the trial of this matter, all of the witnesses admitted that during the entire course of these demonstrations, none of the 2,000 demonstrators, to their knowledge, were guilty of any acts of violence. They also emphasized the fact that the Rev. B. Elton Cox, on several occasions, advised the crowd of demonstrators against the use of violence. No witness saw any actual acts of violence such as street fights, etc., but every single witness, without exception, described the situation as "explosive".

From all of this evidence, which was completely uncontradicted, this Court comes to the inescapable conclusion that: (1) the defendant, CORE, through its agents, officers, representatives, and others acting in concert with it, was directly responsible for and in complete charge of the "protest march" from Scotlandville, Louisiana, to Baton Rouge, Louisiana, on December 15, 1962, culminating in the huge demonstration of some 2,000 people in the vicinity of the Courthouse in downtown Baton Rouge, and the subsequent demonstrations in the business area on Third Street in downtown Baton Rouge; (2) that the leader, identified as Rev. B. Elton Cox, was an officer and representative of CORE, and was in complete charge and control of the demonstrators, who were willing to, and did, obey his every command, even though it entailed and necessitated their violating the law or refusing to obey the orders or instructions emanating from lawfully constituted officials such as the Chief of Police for the City of Baton Rouge, the Sheriff of the Parish of East Baton Rouge, and the Mayor-President of the City of Baton Rouge and Parish of East Baton Rouge; (3) that even though the demonstrators themselves were apparently guilty of no acts of physical violence, it was the considered opinion of the Chief of Police, the Sheriff, and the Mayor-President, and all others who testified that there was a clear and present danger of violence and of a breakdown of governmental authority, and the orderly administration of governmental affairs as a direct result of the manner in which the congregation and demonstration of the estimated 2,000 persons involved was conducted under the apparent leadership of B. Elton Cox; (4) that the Chief of Police, the Sheriff, and the Mayor-President were entirely justified in concluding that the situation on December 15, 1961, was so fraught with impending danger as to require them to take the necessary steps, including the use of tear gas, to immediately disperse the crowd of demonstrators and to bring the mass demonstration to an immediate end.

Having found the facts to be as stated above, from the uncontradicted evidence adduced at the trial of this case, the Court has reached the following conclusions of law.

Jurisdiction is vested in this Court pursuant to 28 U.S.C. § 1331; 28 U.S.C. § 1332; and 42 U.S.C.A. § 1985. Mitchell v. Greenough, 9 Cir., 100 F.2d 184; Condra v. Leslie & Clay Coal Co., D.C., 101 F.Supp. 774; Brewer v. Hoxie School District No. 46, 8 Cir., 238 F.2d 91; and Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939.

Defendants, in their counterclaim, demanded that a three judge court be convened to hear this matter pursuant to the provisions of 28 U.S.C. § 2281. This demand was based upon the contention that the question of the constitutionality of certain State Statutes was at issue. The provisions of 28 U.S.C. § 2281 are not applicable here. In order to invoke the provisions of 28 U.S.C. § 2281 providing for the convening of a three judge court, a substantial question of the constitutionality vel non of a state statute must appear from the face of the pleadings. A mere allegation of unconstitutionality is not enough. Patterson v. Hardin, D.C., 145 F.Supp. 299. To raise a substantial constitutional question, the complainant must "seek to forestall the demands of

some general state policy, the validity of which he challenges". Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800; in the instant case, the counterclaim filed by defendants complains only that there was an *improper application* of certain state statutes to the activities engaged in by the defendants. It is merely alleged by the defendants that the activities engaged in by defendants, and those in concert with them, on December 11 through December 15, 1961, were not criminal in nature, and that such actions were not embraced within the terms of the particular Louisiana Criminal Statutes referred to. The defendants complain only that the "application" of these statutes to the particular acts engaged in by the defendants on those dates was unconstitutional, and as such, deprived the defendants of their constitutionally guaranteed rights of freedom of speech and assembly, and not that the statutes, if *properly* applied, were themselves unconstitutional. The pleadings presented in this case do not raise a serious question of the constitutionality as such of the state statutes involved, and consequently, the defendants' demand for the convening of a three judge court was denied.

The plaintiffs demand that a permanent injunction issue herein in the form and substance of the preliminary injunction previously issued. This preliminary injunction read as follows:

"It is, therefore, ordered, adjudged and decreed that pending further order of this Court, the Congress of Racial Equality and John Doe and Mary Doe, and each of them, and their officers, agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, be and they are hereby restrained and enjoined from continuing to sponsor, finance or encourage unlawful picketing in the City of Baton Rouge, from engaging or participating in any unlawful congregating or marching in the streets or other public ways of the City of Baton Rouge, Louisiana, from conspiring, encouraging or participating in any boycott in restraint of trade, or from doing any other act designed to provoke breaches of the peace or from doing any act in violation of the provisions of LSA–R.S. 14:59, LSA–R.S. 63.4, LSA–R.S. 14:92, LSA–R.S. 14:100.1, LSA–R.S. 14:103, and LSA–R.S. 14:103.1, as well as Title 42 U.S.C. Section 1985, and Title 15 U.S.C. Section 1, et seq."

The Louisiana Statutes, the violations of which were preliminarily enjoined, are criminal in nature and deal principally with prohibitions against (1) remaining upon the property or the business establishment of another after being requested by the owner thereof to leave; (2) inciting, urging or encouraging others to remain upon the property or premises of another, knowing that such person has been forbidden to go or to remain there; (3) enticing or aiding anyone under seventeen years of age to trespass or to violate any law or ordinance of the state, city, or parish; (4) obstructing free, convenient and normal use of the public streets, highways, sidewalks, etc., or restraining traffic or passage thereon; (5) disturbing the peace by using unnecessarily loud, offensive or insulting language, or engaging in any act in a violent or tumultous manner by three or more persons or holding unlawful assemblies such as to unreasonably disturb or alarm the public; (6) preventing or seeking to prevent or interfering or seeking to interfere with the owner or operator of a place of business in the lawful pursuit of his business with his customers, or interfering with other persons who are expressly or impliedly invited upon said premises in the normal course of operating such business.

The Federal Statute, the violation of which was preliminarily enjoined, is Title 42 U.S.C.A. § 1985(3), which reads, in pertinent part, as follows:

"If two or more persons in any State or Territory conspire * * * for the purpose of preventing or

hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; * * * in any case of conspiracy set forth in this section, if one or more persons engaged therein do * * * any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation against any one or more of the conspirators."

The defendants were also enjoined in the preliminary injunction from further violation of the provisions of Title 15 U.S.C.A. § 1 et seq., but since the Court has determined that the alleged violations of that Section of the Federal Statutes is not pertinent to this matter, that Section will not be quoted.

The defendants allege not that these Statutes are unconstitutional in themselves, but that their enforcement against and the application to the particular activities in which the defendants were engaged on December 11 through December 15, 1961, deprives them of their right to freedom of speech and freedom to assemble as guaranteed by the First Amendment to the United States Constitution, and also deprives defendants of their "rights, privileges, and immunities, under the due process and equal protection clause of the Fourteenth Amendment to the United States Constitution". The defendants contend that they have a constitutionally guaranteed right to assemble, speak, and protest against the "State and local racial segregation laws, customs and usages of the City of Baton Rouge, Louisiana". They do not allege that the above-quoted statutes are unconstitutional, but they merely say that their activities on the days in question were "not criminal in nature" and were not "contemplated criminal activities", and

that hence, the statutes in question were improperly applied and invoked by the plaintiffs against them. Hence, it is not the question of constitutionality of these statutes which is before this Court, but only the question of whether or not the enforcement of these statutes under the circumstances of this case deprived the defendants of their constitutional rights, and whether or not the defendants should be restrained and enjoined in the future from violating these statutes and from engaging in the other activities complained of by the plaintiffs.

■ The First Amendment to the United States Constitution provides for freedom of religion and speech; freedom of the press; and the right to peaceably assemble and the right to petition the Government for a redress of grievances. This Amendment secured these rights against abridgment by the Federal Government. The same rights are secured to all persons against abridgment by the States by the Fourteenth Amendment to the United States Constitution. Schneider v. State of New Jersey, 308 U. S. 147, 60 S.Ct. 146, 84 L.Ed. 155; 130 A.L.R. 1278.

■ That the right of freedom of speech and freedom to peaceably assemble is a preferred right granted by the United States Constitution cannot be denied. However, these guaranteed rights are not without their limitations. These rights, while so guaranteed by the United States Constitution, are by no means absolute. They are subject to necessary and essential qualifications. For instance, these rights are subject to the elemental need for order, without which the guarantees of civil rights would be a mockery. Tribune Review Publishing Company v. Thomas, D.C., 153 F.Supp. 486, affirmed 3 Cir., 254 F.2d 883. It is a necessary corollary to these guaranteed rights that the granting of them cannot deprive the State of the power to enforce laws in the legitimate exercise of its police power. People v. Winters, 294 N.Y. 545, 63 N.E. 2d 98. The basic right to freedom of speech and freedom to peaceably assemble must, on occasions, be subordinated to

748

other values and considerations. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, 342 U.S. 842, 72 S.Ct. 20, 96 L.Ed. 636 and, 355 U.S. 936, 78 S. Ct. 409, 2 L.Ed.2d 419; Poulos v. State of New Hampshire, 345 U.S. 395, 73 S.Ct. 760, 97 L.Ed.2d 1105, 30 A.L.R.2d 987.

█ For example, the right of free speech does not carry with it the right to persuade or attempt to persuade others to violate the law. Bullock v. United States, 6 Cir., 265 F.2d 683; 360 U.S. 909, 79 S. Ct. 1294, 3 L.Ed. 1260; Kasper v. Brittain, 245 F.2d 92; 355 U.S. 834, 78 S.Ct. 54, 2 L.Ed.2d 46. Whether an utterance is privileged under the constitutional guarantee of freedom of speech must be determined only after considering the nature of the utterance in connection with the time, place, and manner of its making. United States v. Hartzel, 7 Cir., 138 F.2d 169. It cannot be denied that in the exercise of its police power, the State may restrict by statute the right to freedom of speech or assembly in the interest of public safety. Harisiades v. Shaughnessy, D.C., 90 F.Supp. 397. If such statute or other regulatory measures are adopted by a state pursuant to its police powers, and these statutes are attacked as infringing upon the freedoms guaranteed by the United States Constitution, and Amendments thereto, the Court must attempt to balance the competing public and private interests at stake. Lathrop v. Donohue, 10 Wis.2d 230, 102 N.W.2d 404. A state or municipality may, in the exercise of its police power, curtail or regulate the right and freedom of expression or freedom to assemble, when it is reasonable to believe that the continued exercise of these otherwise constitutionally guaranteed rights present a clear and present danger to the functions of government itself. If there is a clear and present danger to government, or to interests which the state may lawfully protect, then the constitutionally guaranteed rights of freedom of speech and freedom to peaceably assemble are susceptible of restraint. However, to support a finding of clear and present danger, such as will justify the imposition of restraints on these constitutionally guaranteed rights, it must be shown that immediate serious violence was or is to be expected, or that past actions, events, or conduct will reasonably lead to the conclusion that such violence was contemplated or expected. For example, where a mob is obviously ripe for riot, and the mob leader gives the word to start, such an utterance is not protected by the United States Constitution. United States v. Dennis, 2 Cir., 183 F.2d 201, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. If the utterance or assembly is such as to incite people to violence or to threaten the security of community life, or to interfere with the orderly function of governmental authority, then such actions are not constitutionally protected. United States v. Schneiderman, D.C., 102 F.Supp. 87.

█ A city ordinance or a state or federal statute prohibiting persons whose presence interfere with the free use of the streets and sidewalks from remaining thereon after being ordered to disperse by police officers is not unconstitutional as tending to abridge freedom of speech or assembly. City of Tacoma v. Roe, 190 Wash. 444, 68 P.2d 1028.

The freedoms guaranteed by the United States Constitution and the Amendments thereto, and the civil rights accorded by the Statutes of the United States, are freedoms and rights guaranteed to *all* people, and not to a favored few. Experience teaches us, however, that it is seldom possible to accord to any one person or group of persons completely unlimited and unregulated freedoms without thereby depriving others of all or part of the freedoms and rights to which they also are entitled by the very same laws. Thus, when there develops a dispute or controversy between conflicting claims to certain rights and freedoms, it is the function of the Court to attempt to so balance and distribute these rights as between the contending parties as to do the greatest good for the greatest number of people. In attempting to resolve these conflicting claims to civil rights, we must not view the dispute as a contest between the white and the Negro race. To do so

is to appeal dangerously to emotions rather than to the law and common sense. The problem must, instead, be viewed simply as one whose solution is dependent upon an equitable apportionment of the guaranteed rights and freedoms in such a manner as to do substantial justice to *all* of the contending parties. To accomplish this end, these rights must be so apportioned between all citizens as to create as near as possible an equitable balance between the rights and freedoms to which individuals are entitled, and the duties, obligations, and responsibilities necessarily attendant thereon. To deprive one group of citizens of their right to unhampered use of the public streets, highways and sidewalks, to deprive them of unrestricted ingress and egress to public or private buildings, to deprive them of the right to have available, if needed, adequate police protection, to deprive the storekeeper of his right to trade with customers of his own choice and to otherwise conduct his business as he sees fit, to allow interference with the orderly functions of government and to permit disobedience of orders emanating from properly constituted police and governmental authorities in the lawful exercise of their official functions, all in order to give to another group of citizens the right to assemble or to speak in an unrestricted manner, would certainly fall far short of balancing these fundamental rights so as to do substantial justice to all persons involved. It is imperative, if law and order are to be maintained, and if orderly government is to continue to function, that the rights of *all* citizens, regardless of race, color, or creed, be respected and protected to the greatest extent possible.

To look with favor upon members of one segment of society advocating and encouraging their members to trespass and encroach upon the property of others and to "sit in" on the premises of private business establishments, and to refuse to remove themselves therefrom even if requested by the owner or tenant thereof to do so, is to completely ignore the very same right of freedom of choice that should be accorded the storekeeper that the defendants would now have the Court grant to them. The right to freedom of choice and freedom of association should be just as sacred to one segment of society as it is to another. The right of one segment of society to use the public streets and sidewalks at all times must be balanced as nearly as possible with the same right of others to use the same facilities. The right to freely speak and to freely assemble in a peaceful manner must be accorded and protected in such a way as to maintain, at the same time, the rights of others to enjoy a peaceful existence in their community. Certainly the fact that some 2,000 people wish to hold a "rally" and to peacefully demonstrate in support of a cause, may be consistent with the orderly function of government and may not unduly interfere with the basic constitutional rights of others. However, when such a rally reaches the stage of becoming a mob, under the direction of a leader who refuses to heed police orders and instructions, and when such leader openly advocates to the mob, who are apparently willing to obey his every command or suggestion, that they violate existing State laws by entering upon and remaining upon the private property of others, even though they are requested by the owner or tenant to remove themselves therefrom, this sort of "rally" is no longer compatible with orderly government. The same right to due process and equal protection of the laws is accorded by the United States Constitution, and the Amendments thereto, to the shopkeeper, the policeman, the public official, and the members of the Caucasian race as is, of late, so loudly proclaimed to be the right of the Negro. These rights can be protected only so long as the recipient thereof is cognizant of the responsibilities and duties that necessarily accompany the exercise of these rights and freedoms.

It has been urged by the defendants that injunctive relief should not be available to the plaintiff because by resort to the process of arrest, the plaintiff had a remedy at law if state statutes were, in

fact, being violated. Of course, the fallacy in this contention is the fact that it was the arrest of twenty-three Negroes for allegedly violating the statutes in question that was the precipitating cause of the demonstrations complained of. Additional arrests could be reasonably calculated to have created additional causes for demonstration.

There can be no question but what injunctive relief may be had even though the acts complained of were violations of criminal statutes. Milliken v. Stone, D.C., 7 F.2d 397; International Union of Mine, Mill, and Smelter Workers v. Tennessee Copper Co., D.C., 31 F. Supp. 1015; 43 C.J.S. Injunctions § 152, page 764. This Court is of the opinion that there was no improper application or enforcement of the State Statutes in question. The application of these Statutes under the circumstances of this case constituted the necessary and proper exercise of the police powers inherent in the officials of the City of Baton Rouge, the Parish of East Baton Rouge, and the State of Louisiana. Therefore, this Court is of the opinion that the defendants may properly be enjoined and restrained to whatever extent may be necessary from further interference with the duties of the city, Parish, and State officials in the enforcement of those statutes and from further interference with those officials in the exercise of their official duties. Furthermore, this Court also concludes that the defendants were in violation of the provisions of Title 42 U.S.C. A. § 1985(3), and that the plaintiffs are entitled to injunctive relief in connection with those violations. Brewer v. Hoxie School District No. 46, 8 Cir., 238 F.2d 91. The plaintiffs, in the instant case, were public officials who, by their constitutionally imposed duty and by their oath of office, were obligated to support and defend the United States Constitution and the Fourteenth Amendment thereto, and to accord equal protection of the law to all persons, and as such, must be deemed to have a right, which is a federal right, to be free from either direct or indirect interference in the performance of that duty. As the facts in this case clearly show, because of the activities of the defendants, and those acting in concert with the defendants, certain streets, ways, and sidewalks were blocked and obstructed, contrary to the laws of the State of Louisiana, and the ingress and egress to certain buildings, both public and private, were completely blocked insofar as other citizens were concerned. Furthermore, the very fact that the defendants, together with those acting in concert with them, created an obviously dangerous situation, and made it necessary for the entire police force to be utilized in order to preserve the tranquillity of the community and to cope with pending dangers, created a situation whereby there were virtually no police officers or police protection available to the citizens in the other areas of the City of Baton Rouge and the Parish of East Baton Rouge, Louisiana. These citizens in the other locations of the city and Parish were entitled to have available necessary police protection in the event such was needed, and the plaintiffs, as officials of the city and Parish, were under an absolute duty to provide these protections to all citizens. In the Brewer case, the Court considered the question of the issuance of an injunction in connection with the alleged violations of Title 42 U.S.C.A. § 1985(3), and stated that the right of the Federal Court to issue an injunction to protect rights safeguarded by the Constitution and Laws of the United States is well established. The Court said:

"An injunction will issue whenever necessary 'to afford adequate protection of constitutional rights', * * *. Federal courts have the power to afford all remedies necessary to the vindication of federal substantive rights defined in statutory and constitutional provisions except where Congress has explicitly indicated that such remedy is not available. * * *

"The plaintiffs being bound by constitutionally imposed duty and their oaths of office to support the Fourteenth Amendment and to ac-

cord equal protection of the laws to all persons in their operation of the Hoxie Schools must be deemed to have a right, which is a federal right, to be free from direct interference in the performance of that duty. * *

"Plaintiffs are under a duty to obey the Constitution. Const. Art. VI, c. 2. They are bound by oath or affirmation to support it and are mindful of their obligation. It follows as a necessary corollary that they have a federal right to be free from direct and deliberate interference with the performance of constitutionally imposed duty. The right arises by necessary implication from the imposition of the duty as clearly as though it had been specifically stated in the Constitution. * * *

"In the case at bar we think there is no question that plaintiff school board members may be protected by a federal injunction in their efforts to discharge their duty under the Fourteenth Amendment."

The Court further held in the Brewer case that there was sufficient proximity between the members of the school board and the children whose constitutional rights were allegedly impaired, to allow injunctive relief to run directly to and in favor of the members of the school board in order that they might thereby protect the rights of the children for whom they were responsible. The Court said:

"The right does not arise solely from the interest of the parties concerned, but from the necessity of government itself. * * * Though, generally speaking, the right to equal protection is a personal right of individuals, this is only 'a rule of practice', * * * which will not be followed where the identity of interests between the party asserting the right and the party in whose favor the right directly exists is sufficiently close."

The duty of the school board in the Brewer case was, in the opinion of this Court, no greater than was the duty of the plaintiffs in the instant case to make certain that they were, at all times, in a position to uphold the laws of the State, city and Parish, and to protect the community against interference with their constitutionally guaranteed rights. The provisions of 42 U.S.C.A. § 1985(3) very clearly make it a violation of federal law for two or more persons to act in concert for the purpose of depriving, either directly or indirectly, any person or class of persons, of the equal protection of the laws and the equal privileges and immunities under the law. Certainly this statute must be given equal application to all persons who are found to be in violation thereof. The fact that the demonstrators in the instant case did, in fact, deprive other citizens of the City of Baton Rouge and the Parish of East Baton Rouge of equal protection of the law and did, in fact, prevent and hinder the constituted authorities of the State of Louisiana and of the Parish of East Baton Rouge and of the City of Baton Rouge from giving or securing to all persons within the city and Parish the equal protection of the laws, constituted a violation of Title 42 U.S.C.A. § 1985(3), the future violations of which should certainly be enjoined.

Since this Court has come to the inescapable conclusion that under the circumstances of this case, the plaintiffs are entitled to some measure of injunctive relief, it remains to be determined the nature and extent of the relief indicated. A request for injunctive relief is an appeal to the equity jurisdiction of the Court, and is an appeal to the sound discretion which guides the determinations of courts of equity. In Hecht Company v. Bowles, 321 U.S. 321, 64 S.Ct. 587, 88 L. Ed. 754, the Court said:

"The historic injunctive process was designed to deter, not to punish. The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity, has distinguished it. The qualities of mercy and practicality have

made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims."

▮ Thus, the nature of the case, the probability of future violations, the probable extent of future damage reasonably to be anticipated, and the extent of the impairment of the defendants' constitutionally guaranteed rights as balanced against the rights to be accorded to the plaintiffs, are all factors to be considered in determining the extent of the relief granted.

▮ This Court shall make permanent its preliminary injunction insofar as it enjoins the defendants and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them, from financing, sponsoring, encouraging, or engaging in meetings or any other activities whereby violations of existing State or Federal laws are suggested, advocated, or encouraged; from financing, sponsoring, encouraging, or engaging in meetings whereby the public ways, streets, sidewalks, or highways, of the City of Baton Rouge, or the Parish of East Baton Rouge, are blocked, or the unimpaired use thereof denied to other traffic; from financing, sponsoring, encouraging, or engaging in meetings or any other activities wherein or whereby disobedience to the lawful orders of properly constituted law enforcing agencies and their personnel is advocated, suggested or encouraged; from financing, sponsoring, encouraging, or engaging in meetings or any other activities designed or held for the purpose of impeding or obstructing the administration of justice or the orderly functions of government; and from financing, sponsoring, or encouraging, or engaging in any activities designed to, or which do, impede, hinder, or obstruct officers of the law, or officials of the Parish of East Baton Rouge, or the City of Baton Rouge, from performing and discharging the duties of their respective offices.

The demands for injunctive relief contained in the defendants' counterclaim are denied.

A decree in accordance herewith shall be prepared and submitted.